IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

JANE DOE I, JANE DOE II, AND JOHN DOE, BY AND THROUGH CONSERVATOR,
FLEMING AND CURTI PLC,
*Plaintiffs/Appellants,*

*v.*

THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, A UTAH CORPORATION SOLE; THE CHURCH OF JESUS
CHRIST OF LATTER-DAY SAINTS, A UTAH CORPORATION SOLE; DR. JOHN
HERROD AND SHERRIE FARNSWORTH HERROD, INDIVIDUALLY AND AS A
JOINTLY MARRIED COUPLE; AND ROBERT KIM MAUZY AND MICHELLE
MORGAN MAUZY, INDIVIDUALLY AND AS A JOINTLY MARRIED COUPLE,
*Defendants/Appellees.*

No. CV-25-0213-PR
Filed July 30, 2026

Appeal from the Superior Court in Cochise County
The Honorable Timothy B. Dickerson, Judge
No. S0200CV202000599
**AFFIRMED**

Memorandum Decision of the Court of Appeals, Division Two
No. 2-CA-CV 23-0293
Filed July 29, 2025
**VACATED**

COUNSEL:

Lynne M. Cadigan, Lynne Cadigan Law, PLLC, Tucson; John J. Trebon (argued), John Trebon P.C., Flagstaff; and John C. Manly, Manly, Stewart & Finaldi, Irvine, CA, Attorneys for Jane Doe I, Jane Doe II, John Doe, and Fleming & Curti PLC

Paul D. Clement (argued), Andrew C. Lawrence, Barrett L. Anderson, Clement & Murphy, PLLC, Alexandria, VA; and William Maledon, Scott W. Rodgers, Joseph N. Roth, Osborn Maledon, P.A., Phoenix, Attorneys for

The Corporation of the President of The Church of Jesus Christ of Latter-day Saints, The Church of Jesus Christ of Latter-day Saints, Dr. John Herrod, Sherrie Farnsworth Herrod, Robert Kim Mauzy, and Michelle Morgan Mauzy

Stanley G. Feldman, Max W. Larnerd, Miller, Pitt, Feldman & McAnally P.C., Tucson, Attorneys for Amicus Curiae Arizona Association for Justice

David P. Brooks, Brooks & Affiliates, PLC, Mesa; and Eric S. Baxter, Benjamin J. Fleshman, The Becket Fund for Religious Liberty, Washington, DC, Attorneys for Amicus Curiae The Becket Fund for Religious Liberty

David P. Brooks, Brooks & Affiliates, PLC, Mesa; and Gene C. Schaerr, James C. Phillips, Schaerr Jaffe LLP, Washington, DC, Attorneys for Amici Curiae General Conference of Seventh-Day Adventists, et al.

Brett W. Johnson, Ryan J. Regula, Tracy A. Olson, Charlene A. Warner, Snell & Wilmer L.L.P., Phoenix, Attorneys for Amici Curiae Roman Catholic Diocese of Gallup, et al.

———————

VICE CHIEF JUSTICE LOPEZ authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER and JUSTICES BOLICK, BEENE, MONTGOMERY, KING, and CRUZ joined.

———————

VICE CHIEF JUSTICE LOPEZ, Opinion of the Court:

¶1        We consider several issues concerning a clergy member's duty under Arizona statutory law to report abuse of a minor when a member of a religious congregation admits such abuse to the clergy member.  Resolution of these issues turns solely on the interpretation of Arizona statutes and the application of federal constitutional principles, rather than public policy or the factual merits of the minor victims' claims.

¶2          We must decide if a factfinder—a court or jury—may inquire into whether a clergy member violated religious doctrine by failing to report abuse of a minor. Subsection (A) of A.R.S. § 13-3620 (the "Reporting Statute") requires "[a]ny person who reasonably believes that a minor" is the victim of abuse to "immediately report or cause reports to be made." The Reporting Statute, however, allows a clergy member who receives "a confession or confidential communication" to refrain from reporting the "confession" or "confidential communication" if the clergy member "determines that it is reasonable and necessary within the concepts" of the clergy member's religion. § 13-3620(A) (the "Clergy Exemption"). We hold that the First Amendment generally prohibits factfinders from inquiring into a clergy member's application of his particular religious doctrine—absent fraud or collusion for secular purposes—in determining whether reporting should be withheld if "reasonable and necessary."

¶3          We next determine the meaning of the terms "confession" and "confidential communication" in the Reporting Statute. We hold that "confession" means "a confidential acknowledgment or admission of a crime, sin, or fault to a member of the clergy, priest, or Christian Science practitioner for the purpose of absolution." A "confidential communication" refers to "speech or correspondence that is treated as private or made in confidence, generally under circumstances that indicate the communication is intended only for the person or persons addressed." The First Amendment, however, requires courts to exercise substantial deference to a religious institution's own doctrinal conception of "confession" or "confidential communication."

¶4          Finally, we resolve whether a factfinder may determine who qualifies as a "member of the clergy." We hold that the First Amendment protects the right of a religious institution to define who is a "member of the clergy" and, absent fraud or collusion for secular purposes, prohibits factfinders from inquiring into the religious institution's designation of clergy.

**BACKGROUND**

¶5          During their marriage and between 2005 and 2015, Paul and Leizza Adams had six children, three of whom are the Plaintiffs-Appellants

in this case: Jane Doe I, Jane Doe II, and John Doe (collectively, the "Does"). Around 2011, Paul met privately with Bishop John Herrod ("Bishop Herrod") and revealed that he had sexually abused one of the Does. At the time, Bishop Herrod was bishop of the Bisbee Ward (the "Bisbee Ward") of The Church of Jesus Christ of Latter-day Saints (the "Church"). Following Paul's revelation, Bishop Herrod scheduled an additional meeting with Paul and Leizza, during which Paul again revealed his abuse. In 2012, Bishop Robert "Kim" Mauzy ("Bishop Mauzy") replaced Bishop Herrod as bishop of the Bisbee Ward of the Church.

¶6 During the leadership transition from Bishop Herrod to Bishop Mauzy (collectively, the "Bishops"), Bishop Herrod informed Bishop Mauzy of Paul's sexual abuse disclosures. Based on this information, Bishop Mauzy convened a formal disciplinary council (the "Council") proceeding, during which Paul again revealed his abuse to several members of the Church serving on the Council, including Bishop Mauzy. Following Paul's disclosures to the Council, Bishop Mauzy excommunicated Paul from the Church.

¶7 The Bishops claim that their knowledge of Paul's abuse is limited to admissions he made in his meetings with Bishop Herrod and the Council. The Bishops considered Paul's admissions to be confidential communications or confessions received in their role as bishops of the Church. According to Church doctrine, as alleged by the Church and reflected in the Church's General Handbook (the "Handbook"), bishops have a solemn duty to maintain confidentiality of all information members offer in such confessions and interviews. This duty of confidentiality extends to all who participate in the Council. On familial issues, Church doctrine also dictates that bishops counsel husbands and wives together and that such meetings are considered confidential.

¶8 In 2017, after the Department of Homeland Security discovered a video of Paul's abuse online, Paul and Leizza were indicted on charges relating to Paul's abuse of the Does. Leizza pleaded guilty and was sentenced to two and a half years in prison. Paul confessed his abuse to law enforcement but committed suicide in jail prior to trial. After learning of Paul's disclosures to the Bishops and Council members, the Does sued The Corporation of the President of The Church of Jesus Christ

of Latter-day Saints, the Church, the Bishops and their spouses (collectively, the "Church Defendants"), and other parties.[1]  The Does alleged several claims against the Church Defendants arising from Paul's abuse including negligence, breach of fiduciary duty, and civil conspiracy.  The Does' claims, in part, arose from the Church Defendants' alleged failure to comply with the Reporting Statute.

¶9　　　　The Church Defendants moved for summary judgment, arguing, in part, that they did not owe a duty to the Does under the Reporting Statute.  The trial court granted the Church Defendants' summary judgment motion predicated on the following rulings: (1) Paul's communications to Bishop Herrod, his disclosure to Leizza in Bishop Herrod's presence, and his communications to the Council were confidential communications or confessions that Bishops Herrod and Mauzy received in their role as clergy members; and (2) the Bishops "determined that not reporting the communications was 'reasonable and necessary within the concepts of the [Church's] religion.'"  The court noted that "[i]t is not for a [c]ourt or a jury to tell a clergyman that he is wrong about the concepts of his religion" and ultimately concluded that the "Church Defendants were not required under the Mandatory Reporting Statute to report the abuse . . . because their knowledge of the abuse came from confidential communications which fall within the [Reporting Statute's] clergy-penitent exception."  The court also ruled that the "Church Defendants did not breach a duty owed" to the Does.

¶10　　　　The court of appeals, in a memorandum decision, reversed the trial court's ruling, finding genuine issues of material fact "as to the Church Defendants' duty to report under" the Reporting Statute.  *Doe v. The Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, No. 2 CA-CV 2023-0293, 2025 WL 2158205, at *7 ¶ 35 (Ariz. App. July 29, 2025) (mem. decision).  Notably, the court centered much of its analysis on the

---

[1]  The Does also named Lenzner Medical Services, LLC ("Lenzner"), and Shaunice Warr ("Warr") as defendants in their First Amended Complaint. The trial court granted Warr's Motion for Summary Judgment and dismissed her from the underlying complaint.  That ruling is the subject of a separate petition pending before this Court, and none of the claims relating to Lenzner or Warr are before us here.

statutory clergy-penitent privilege in A.R.S. § 12-2233 (the "Clergy-Penitent Privilege"). *Id.* at *4–5 ¶¶ 20–26. The court held that a reasonable factfinder could conclude that Bishop Herrod merely "observed" Paul's confession to Leizza and, thus, waived the Clergy-Penitent Privilege. *Id.* at *5 ¶¶ 25–26. The court also surmised that a jury could "reasonably infer" that Paul's confession to the Council "waived the [C]lergy-[P]enitent [P]rivilege" and concluded there was a "genuine issue of material fact as to whether Paul's statements before the council invoked the Church Defendants' [Reporting Statute] duty to report." *Id.* at *6 ¶ 30. Finally, based on the court's interpretation of the Handbook, which required disclosure when necessary to prevent "serious injury," *id.* at *6 ¶¶ 33–34, the court held that a genuine issue of material fact existed as to "whether it was 'reasonable and necessary' for [the] Church Defendants to withhold reporting" based on the "question of whether the Church Defendants violated Church doctrine by not reporting Paul to the authorities," *id.* ¶ 34.

¶11 The Church Defendants petitioned this Court for review. We granted review to resolve recurring issues of statewide importance: the interpretation and application of the Reporting Statute, and whether the First Amendment allows a factfinder to inquire into a clergy member's doctrinal duty to report under the statute. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

¶12 Absent genuine issues of material fact, and when one party is entitled to judgment as a matter of law, summary judgment is appropriate. Ariz. R. Civ. P. 56(a). "[W]e review a grant of summary judgment de novo, viewing the evidence in the light most favorable to the party against whom summary judgment was entered." *Dabush v. Seacret Direct LLC*, 250 Ariz. 264, 267 ¶ 10 (2021). We also review questions of statutory interpretation de novo. *Planned Parenthood Ariz., Inc. v. Mayes*, 257 Ariz. 137, 142 ¶ 13 (2024).

## I.

¶13 We begin with the statute at the center of the parties' dispute over the Church Defendants' duty to report Paul's abuse of the Does.

Under Arizona's Reporting Statute, "[a]ny person who reasonably believes that a minor is or has been the victim of physical injury, abuse, child abuse, a reportable offense or neglect . . . shall immediately report or cause reports to be made of this information . . . ." § 13-3620(A). However:

> A member of the clergy . . . who has received a confidential communication or a confession in that person's role as a member of the clergy . . . in the course of the discipline enjoined by the church to which the member of clergy . . . belongs may withhold reporting of the communication or confession if the member of the clergy . . . determines that it is reasonable and necessary within the concepts of the religion.

*Id.* The Clergy Exemption only applies to "the communication or confession and not to personal observations the member of the clergy . . . may otherwise make of the minor." *Id.*

## II.

¶14 As an initial matter, we address the court of appeals' misapprehension of the relevance of the statutory Clergy-Penitent Privilege to the Bishops' reporting duties under the Reporting Statute. The Does also base the thrust of their briefing on the centrality of the Clergy-Penitent Privilege to this case.

¶15 Subsection (N) in the Reporting Statute provides that:

> In any civil or criminal litigation in which . . . child abuse . . . is an issue, a member of the clergy . . . shall not, *without his consent*, be examined as a witness concerning any confession made to him in his role as a member of the clergy . . . in the course of the discipline enjoined by the church to which he belongs.

§ 13-3620(N)[2] (emphasis added) (the "Clergy Privilege"). The Clergy Privilege, however, is a testimonial privilege and "does not discharge a member of the clergy . . . from the duty to report pursuant to [the Reporting Statute's] subsection A." *Id.* Here, the court of appeals opined that the Clergy Privilege does not create "an independent evidentiary privilege for the clergy apart from the communicant's [C]lergy-[P]enitent [P]rivilege" in § 12-2233. *Doe*, 2025 WL 2158205, at *4 ¶ 19 (citing *Church of Jesus Christ of Latter-Day Saints v. Superior Court*, 159 Ariz. 24, 30–31 (App. 1988)). We disagree.

**¶16** The text of the Clergy-Penitent Privilege statute and the Reporting Statute identifies the privilege holder, its scope, and applicable exceptions. The civil statutory Clergy-Penitent Privilege provides that, in civil actions, "a clergyman . . . shall not, *without the consent of the person making a confession*, be examined as to any confession made to him in his character as clergyman . . . in the course of discipline enjoined by the church to which he belongs." § 12-2233 (emphasis added); *see also* A.R.S. § 13-4062(3) (the equivalent criminal clergy-penitent privilege). Thus, the civil clergy-penitent statute designates the person making the confession as the privilege holder. *See* § 12-2233. In contrast, the Clergy Privilege identifies the clergy member as the privilege holder. *See* § 13-3620(N).

**¶17** In addition to the Reporting Statute's testimonial Clergy Privilege, the Clergy Exemption provides broader protection from disclosing confidential religious communications than the Clergy-Penitent Privilege. *See* § 13-3620(A), (N); § 12-2233. The protections of the Clergy Exemption extend to a "confidential communication" or "confession," while the Clergy-Penitent Privilege applies only to a "confession."

**¶18** As for the privileges' exceptions, § 13-3620(M)(1)–(3)[3] precludes the Clergy-Penitent Privilege's application to any "[c]ivil or criminal litigation . . . in which a minor's neglect, dependency, abuse, child

---

[2] Previously § 13-3620(L). *See* 2026 Ariz. Sess. Laws ch. 143, § 1 (2d Reg. Sess.).

[3] Previously § 13-3620(K)(1)–(3). *See* 2026 Ariz. Sess. Laws ch. 143, § 1 (2d Reg. Sess.).

abuse, physical injury or abandonment is an issue"; judicial proceeding "resulting from a report, information, or records submitted" pursuant to the Reporting Statute; or "[i]nvestigation of a minor's child abuse, physical injury, neglect or abuse conducted by a peace officer or the department of child safety." Yet, in the same statutory section—subsection (M)—the Legislature expressly preserved the Clergy Privilege set out in § 13-3620(N). § 13-3620(M) ("Except for the attorney client privilege or the privilege under subsection N of this section, no privilege applies . . . .").

**¶19** The Legislature has the authority to carve out express exceptions to statutory privileges. *See State v. Zeitner*, 246 Ariz. 161, 166 ¶ 20 (2019) (discussing the physician-patient privilege and observing that, "[i]n many instances, the [L]egislature has created express exceptions to the privilege within the language of the applicable statutes"). Section 13-3620(M) typifies such an express exception to the statutory Clergy-Penitent Privilege. Although the Clergy Privilege absolves a clergy member of the duty to testify, it does not eliminate the Reporting Statute's duty to report. *See* § 13-3620(N) ("This subsection does not discharge a member of the clergy, a Christian Science practitioner or a priest from the duty to report pursuant to subsection A of this section."). Of course, a clergy member's duty to report a minor's abuse is not categorical; instead, it is subject to the Clergy Exemption's conditions—the meaning and application of which we must resolve in this case. But what is clear is that the Clergy-Penitent Privilege is inapplicable under the Reporting Statute and, thus, irrelevant to the Church Defendants' duty to report.

**¶20** We note that the court of appeals' misapplication of the Clergy-Penitent Privilege is not novel—the court adopted from *Church of Jesus Christ of Latter-Day Saints* the notion that the Reporting Statute did "not create a statutory clergyman's privilege independent of the penitent's privilege under A.R.S. § 12–2233." *Doe*, 2025 WL 2158205, at *4 ¶ 19 (citing *Church of Jesus Christ of Latter-Day Saints*, 159 Ariz. at 30–31). *Church of Jesus Christ of Latter-Day Saints* reasoned that the Clergy Privilege's purpose was "to require the clergy to report child abuse cases . . . but not to invade unnecessarily the priest/penitent privilege in A.R.S. § 12-2233." 159 Ariz. at 31. Although we agree the Reporting Statute's Clergy Privilege is intended to curtail undue intrusion into clergy-penitent communications, *Church of Jesus Christ of Latter-Day Saints* misconstrued its purpose. The

Clergy Privilege insulates a *clergy member* from disclosing information deemed doctrinally confidential; it does not protect the penitent's privacy rights. The Clergy Privilege precludes the state from compelling a clergy member to testify in circumstances which would violate his religious oath and duties. This aligns with the Reporting Statute's deference to the clergy member embodied in the Clergy Exemption from reporting abuse of a minor *if* it is required by religious doctrine. As discussed below, the First Amendment compels such deference. Thus, we disavow *Church of Jesus Christ of Latter-Day Saints* to the extent it conflates the purpose and effect of the Clergy-Penitent Privilege and Clergy Privilege and Clergy Exemption.

## III.

¶21        We now turn to the parties' fundamental dispute: may a factfinder—a court or jury—inquire into whether a clergy member followed religious doctrine by refraining from reporting the abuse of a minor.

### A.

¶22        The First Amendment provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I (respectively, the "Establishment Clause" and "Free Exercise Clause") (collectively, the "Religion Clauses"). The First Amendment's protections apply to the states through the Fourteenth Amendment. *See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 115 (1952).

¶23        The Founders adopted the First Amendment, in part, to prevent the repetition of certain practices under 16th-century British statutes which gave "the Crown the power to fill high 'religious offices' and to control the exercise of religion in other ways . . . ." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 748 (2020). Thus, the Religion Clauses evince "a spirit of freedom for religious organizations, an independence from secular control or manipulation . . . ." *Kedroff*, 344 U.S. at 116 (discussing *Watson v. Jones*, 80 U.S. 679 (1872)). Put simply, the Religion Clauses give religious institutions the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.*

¶24        The United States Supreme Court applied *Kedroff*'s guiding principles to fashion the "ecclesiastical abstention" doctrine that courts apply in cases involving the Religion Clauses. *See Serbian E. Orthodox Diocese for U. S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976) (discussing "the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law"); *see also Our Lady of Guadalupe Sch.*, 591 U.S. at 746 ("Among other things, the Religion Clauses protect the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 186 (2012))). Our court of appeals has recognized that the "ecclesiastical abstention" doctrine precludes courts from inquiring into "matters concerning 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required for them.'" *Christakis v. Deitsch*, 250 Ariz. 246, 249 ¶ 5 (App. 2020) (quoting *Ad Hoc Comm. of Parishioners of Our Lady of the Sun Cath. Church v. Reiss*, 223 Ariz. 505, 510 ¶ 12 (App. 2010)).

**B.**

¶25        The Clergy Exemption within the Reporting Statute requires five elements to exempt a religious official from the duty to report abuse of a minor: that person must be (1) a member of the clergy, who (2) receives a confidential communication or confession, (3) in that person's role as a member of the clergy, (4) in the course of discipline enjoined by the church to which the member of clergy belongs, and (5) determines that it is reasonable and necessary within the concepts of the religion to withhold reporting. § 13-3620(A).

¶26        We address the permissible inquiry a factfinder may make into each Clergy Exemption element and apply these principles to this case.

1.

¶27          We begin with the Clergy Exemption's first element—clergy membership. *Id.*

a.

¶28          The right of a religious institution to select its clergy members is practically plenary.    Unless an improper method of choice is proven—such as acts undertaken in bad faith like fraud or collusion for secular purposes—the freedom to select clergy and to decide other matters that are "purely ecclesiastical" is under "federal constitutional protection as a part of the free exercise of religion against state interference." *Kedroff*, 344 U.S. at 116 & n.23; *Serbian E. Orthodox*, 426 U.S. at 713; *see also Our Lady of Guadalupe Sch.*, 591 U.S. at 746 (finding that "the selection of the individuals who play certain key roles" in a religious institution is a protected component of religious autonomy under the Religion Clauses). This freedom emanates from the notion that "[i]n a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition." *Our Lady of Guadalupe Sch.*, 591 U.S. at 757.    Consistent with federal jurisprudence, in *Rashedi v. Gen. Bd. of Church of Nazarene*, our court of appeals held that "[w]hether an individual is qualified to be a clergy member of a particular faith is a matter to be determined by the procedures and dictates of that particular faith." 203 Ariz. 320, 323 (App. 2002).  To be clear, however, if church members commit fraud or collusion to further a secular purpose, such as avoiding legal responsibilities, they may be held liable. *See Cantwell v. Connecticut*, 310 U.S. 296, 306 (1940) ("Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. Certainly penal laws are available to punish such conduct.").

b.

¶29          The Does do not contend that the Bishops were not members of the clergy, nor do they allege that the Church's internal procedures embody an improper method of choice for identifying clergy membership.

*See Kedroff*, 344 U.S. at 116.  This is unsurprising, as it is not the province of a court or jury to dictate a religious institution's clergy membership requirements.  *See Our Lady of Guadalupe Sch.*, 591 U.S. at 746.

¶30        Instead, the Does' primary contention concerning clergy membership rests on the premise that it is "not a given that everyone present at the disciplinary council meetings were clergy."  From this presumption, the Does contend that "[i]f just one person at the disciplinary council meetings was not determined to be clergy under the [] Church's 'ecclesiastical rule, customs and laws,' then the [C]lergy-[P]enitent [P]rivilege was likely waived."  Thus, the Does argue that Paul and Bishop Mauzy waived the Clergy-Penitent Privilege because Paul admitted his abuse before non-clergy Church members during Council proceedings.  But this argument does not advance the Does' position because waiver of the Clergy-Penitent Privilege does not resolve whether the Reporting Statute required clergy members to report Paul's abuse.  *See supra* ¶¶ 14–20.  Under the Reporting Statute, so long as Paul's admissions before the Council qualify as a "confession" *or* "confidential communication" pursuant to Church doctrine, the fact that non-clergy members also may have heard the admissions would not undermine Bishop Mauzy's status as a clergy member or his ability to receive Paul's admissions as a confession or confidential communication in that role.

2.

¶31        We next consider the Reporting Statute's second element—the existence of a "confession" or "confidential communication." § 13-3620(A).

a.

¶32        The United States Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45 (1987). We are mindful of the First Amendment's prohibition against "employing religious organizations as an arm of the civil judiciary to perform the function of interpreting and applying state standards[,]" but in order to

avoid conflict with the Establishment Clause, a particular church or religious organization's doctrine must necessarily inform the types of admissions or acknowledgments that qualify as "confessions." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969). The same principle applies to "confidential communications," particularly whether the religion's doctrine considers a communication private or confidential.

¶33        The Reporting Statute does not define the terms "confession" or "confidential communication," which the Legislature added to the statute in 1990. *See* 1990 Ariz. Sess. Laws ch. 384, § 12 (2d Reg. Sess.). "Absent statutory definitions, courts apply common meanings . . . and may look to dictionaries." *State v. Pena*, 235 Ariz. 277, 279 ¶ 6 (2014) (internal citations omitted).

¶34        In 1990, "confession" meant an "[a]knowledgment of a crime or fault" and an "acknowledgment of sin to a priest; a sect; a denomination." *Confession*, Webster's New Dictionary and Thesaurus (1990). Similarly, "confess" meant "to acknowledge fully, to own or admit, [and] to make known, as sins to a priest." *Confess*, Webster's New Dictionary (1990). Historically, "confession" in the religious context embodied the notion of disclosure for the purpose of absolution. *See Confess*, New Websterian Dictionary (1912) (defining "confess" as "disclose the state of one's conscience to a priest or receive absolution"). Our courts have also effectively recognized confidentiality as a component of "confession" by implication through the waiver doctrine. *See, e.g.*, *State v. Archibeque*, 223 Ariz. 231, 236 ¶¶ 16–18 (App. 2009) ("[W]e conclude that the clergy-penitent privilege under § 13-4062(3) was not waived by the presence of Archibeque's wife if Archibeque believed the communication would remain private and such belief is reasonable.").

¶35        Guided by established First Amendment principles and the Reporting Statute's text, "confession" means "a confidential acknowledgment or admission of a crime, sin, or fault to a member of the clergy, priest, or Christian Science practitioner for the purpose of absolution." *See Confession*, Webster's New Dictionary and Thesaurus (1990); *Confess*, Webster's New Dictionary (1990); *Confess*, New Websterian Dictionary (1912); *Archibeque*, 223 Ariz. at 236 ¶¶ 16–18; § 13-3620(A).

14

¶**36**      We next define "confidential communication" under the Reporting Statute. "Confidential," in common parlance in 1990, meant "treated with confidence, private, secret," *Confidential*, Webster's Dictionary (1990), and "communication" indicated "the act of making known" and "intercourse by speech, correspondence, messages, etc.," *Communication*, Webster's Dictionary (1990). As a legal term of art, "confidential communication" was defined at the time as "[p]rivileged communications such as those between spouses, physician-patient, attorney-client, confessor-penitent, etc." and "a statement made under circumstances showing that [the] speaker intended [the] statement only for [the] ears of [the] person addressed." *Confidential Communication*, Black's Law Dictionary (6th ed. 1990). The standard and legal dictionary definitions of "confidential communication" align. Thus, "confidential communication" in the Reporting Statute means "speech or correspondence that is treated as private or made in confidence, generally under circumstances that indicate the communication is intended only for the person or persons addressed." *See Confidential*, Webster's Dictionary (1990); *Communication*, Webster's Dictionary (1990); *Confidential Communication*, Black's Law Dictionary (6th ed. 1990).

¶**37**      This definition is consistent with our court of appeals' conception of confidential communications in the privilege waiver context. *See, e.g., Archibeque*, 223 Ariz. at 236 ¶¶ 15–16 (determining the "relevant inquiry" into confidentiality, in the context of privilege waiver, "to be whether the communicant reasonably understood the communication to be confidential" and that a communication remains confidential if the communicant "believed the communication would remain private and such belief is reasonable"); *see also Waters v. O'Connor*, 209 Ariz. 380, 385 ¶ 23 (App. 2004) (analyzing "confidential communications" and limiting the term "only [to] those communications anchored in the ecclesiastical rules, customs and laws of the applicable religious group").

¶**38**      Our definitions of "confession" and "confidential communication" pass Establishment Clause muster because they broadly apply to a variety of religious denominations. *See Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247 (2025) ("[T]he government may not 'officially prefe[r]' one religious denomination over

15

another." (second alteration in original) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982))). Our approach also allows for a religious institution's interpretation of these concepts pursuant to its doctrine. *See Waters*, 209 Ariz. at 382 ¶ 10 n.2 (noting that "a narrow construction of the confession requirement so that only penitential communications would be protected would raise First Amendment concerns").

**¶39** The Reporting Statute reflects this same deference by focusing on the subjective view of the clergy member, rather than the communicant, and by requiring that "confessions" or "confidential communications" be made to a clergy member *in the course of discipline* enjoined by the church to which the member of the clergy belongs. § 13-3620(A) (emphasis added); *see also Waters*, 209 Ariz. at 385 ¶ 23 (finding the course of discipline requirement in the statutory Clergy-Penitent Privilege necessitates "communications [to be] anchored in the ecclesiastical rules, customs and laws of the applicable religious group"). The First Amendment's constraint on courts against resolving matters involving the interpretation of church discipline, doctrine, and internal procedures extends to what qualifies as a "confession" or "confidential communication" under established customs and rules. *See Christakis*, 250 Ariz. at 249 ¶ 5. This broad interpretive deference also avoids the potential for government coercion that could arise from a narrower construction of the Legislature's language. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 537 (2022) (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952), for the proposition that the government may not "force citizens to engage in 'a formal religious exercise'").

**¶40** Finally, under this construction, the Reporting Statute's underlying secular purpose—promoting the welfare of children—remains intact, despite the accommodation afforded to religious practices. *See Hobbie*, 480 U.S. at 144–45 ("[T]he government may (and sometimes must) accommodate religious practices and . . . it may do so without violating the Establishment Clause.").

b.

**¶41** The Reporting Statute implicitly requires the party asserting the Clergy Exemption to produce the relevant doctrinal facts and standards to invoke it. *See* § 13-3620(A) (premising the reporting exemption on the

clergy member's view that withholding of reporting is "reasonable and necessary" "in that person's role" and in the "course of discipline enjoined by the church to which *the member of the clergy*" belongs (emphasis added)). As with the Clergy-Penitent Privilege, a person asserting the Reporting Statute's Clergy Exemption necessarily must establish its applicability. *See, e.g.*, *Waters*, 209 Ariz. at 385 ¶ 24 (rejecting Waters' assertion of the Clergy-Penitent Privilege because she failed to establish that a church member to whom she confessed was a "clergyman").

**¶42**        The Church Defendants have outlined Church doctrine concerning confession. In support of their summary judgment motion, they explained that the Church has adopted the "fundamental Christian doctrines of repentance and confession." Under these doctrines, Church members should "confess to [the bishop] if they have committed serious sins." Bishops, in turn, have a responsibility to counsel individual members, aid them in their efforts to repent, and act as the members' confessor. Bishops "have a solemn duty to keep confidential all information that members give [] them in confessions and interviews." This duty of confidentiality "applies to all who take part in Church disciplinary councils." Bishops may only share confidential information with other "authorized ecclesiastical leaders." Also, "[b]ishops often meet with husbands and wives together to counsel about marriage and family problems," and "such meetings are just as confidential as meeting with someone alone."

**¶43**        The Church's factual assertions regarding its own doctrine establish that a "confession" is the admission of sin to a bishop. Under Church doctrine, "abuse cannot be tolerated in any form" as it "violates the laws of God." The Church classified Paul's admissions of abuse to Bishop Herrod, both individually and in the presence of Leizza, as confessions. We must afford deference to the Church's understanding of what constitutes an admission of fault or sin. *See Our Lady of Guadalupe Sch.*, 591 U.S. at 746 (explaining that courts do not have the constitutional authority to interpret religious doctrine).

**¶44**        Given the Church's classification of Paul's abuse as violating the laws of God, and the Church's assertion that Paul's admissions to Bishop Herrod—alone and in Leizza's presence—were confessions, we

conclude that Paul's admissions to Bishop Herrod constituted "confessions" for purposes of the Reporting Statute. Any further inquiry into whether Paul's admissions qualify as confessions is explicitly doctrinal. Under the First Amendment, such inquiry is beyond the purview of the factfinder and, thus, leaves no genuine issue of material fact regarding whether Paul's admissions to Bishop Herrod qualify as "confessions." *See id.*

¶45 The Church Defendants have also outlined Church doctrine concerning confidential communications, which mandates a strict duty of confidentiality for anyone who participates in Council proceedings and requires bishops to maintain the confidentiality of information shared among other authorized ecclesiastical leaders. As with confessions and other religious doctrinal matters, we must defer to the Church's doctrine concerning "confidential communications." *See id.*

¶46 The Church deemed any communication Paul made during the Council proceeding confidential under Church doctrine. Thus, we conclude that Paul's alleged admissions to the Council were, at a minimum, "confidential communications" for purposes of the Reporting Statute. We also deem Paul's admissions to Bishop Herrod, alone and in Leizza's presence, "confidential communications." To the extent Bishop Herrod discussed Paul's admissions with Bishop Mauzy, or Bishop Mauzy with Council members, those communications, too, were confidential under the Church's doctrine, which allows such confidential discussions among authorized ecclesiastical leaders.

¶47 The Does' argument that Paul's admissions before non-clergy Council members waived the Clergy-Penitent Privilege does not foreclose our holding that those admissions are confidential communications pursuant to Church doctrine and, thus, justify the Church Defendants' failure to report Paul's abuse under the Reporting Statute.

¶48 Similarly, because we deem the Clergy-Penitent Privilege irrelevant to the Church Defendants' duty to report Paul's abuse, *see supra* ¶¶ 14–20, we need not address the Does' remaining arguments expressly predicated on waiver of the Clergy-Penitent Privilege, including that the Church Defendants failed to make a prima facie showing of the

Clergy-Penitent Privilege under *State ex rel. Adel v. Adleman*, 252 Ariz. 356 (2022); that Bishop Herrod did not consider Paul's confession before Leizza confidential because he urged Paul and Leizza to report Paul's abuse to law enforcement (which ignores Bishop Herrod's request, due to confidentiality, for Paul's permission to report the abuse); and that Bishops Herrod and Mauzy had a duty to report Leizza's "obvious child neglect." These arguments fail because we conclude that the communications at issue between Bishop Herrod, Bishop Mauzy, Paul, Leizza, and the Council were "confidential communications" under Church doctrine and the Reporting Statute.

**¶49** We briefly address the court of appeals' assertion that Bishop Herrod "did not receive Paul's confession to Leizza; he merely observed it." *Doe*, 2025 WL 2158205, at *5 ¶ 25. Although the court noted that the Reporting Statute "does not exempt a clergy member's personal observations," *id.*, it omitted the rest of the relevant statutory language—"personal observations the member of the clergy . . . may otherwise make *of the minor*[,]" § 13-3620(A) (emphasis added). The Does do not allege that they were present for Paul's admission to Leizza in Bishop Herrod's presence. Thus, the Reporting Statute's "personal observation" exemption is irrelevant to this admission.

3.

**¶50** We now consider the Reporting Statute's third and fourth elements—whether Church clergy received Paul's confessions or confidential communications in their role as clergy (third element) while in the course of discipline enjoined by the Church (fourth element). § 13-3620(A).

a.

**¶51** Courts may not inquire into ecclesiastical matters such as the "conformity of the members of the church to the standard of morals required for them." *Christakis*, 250 Ariz. at 249 ¶ 5 (quoting *Reiss*, 223 Ariz. at 510 ¶ 12); *see also Our Lady of Guadalupe Sch.*, 591 U.S. at 757 ("In a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by

every person who performs a particular role in every religious tradition."); *Kedroff*, 344 U.S. at 116 & n.23 (observing that, absent fraud or collusion for secular purposes, the freedom to decide matters that are "purely ecclesiastical" is under "federal constitutional protection as a part of the free exercise of religion against state interference"). Thus, the religious institution's doctrine determines whether a clergy member received a "confession" or "confidential communication" in their role as clergy. *See* § 13-3620(A). We accord the same deference to whether the communication or confession was received "in the course of discipline enjoined by the church to which the member of the clergy . . . belongs." *Id.*; *see also Waters*, 209 Ariz. at 385 ¶ 23 (finding the course of discipline requirement in the statutory Clergy-Penitent Privilege necessitates "communications [to be] anchored in the ecclesiastical rules, customs and laws of the applicable religious group").

¶**52** Although courts may not inquire into whether clergy members adhered to the religion's doctrine and principles, this prohibition does not foreclose inquiry into whether an issue in controversy actually implicates the religion's doctrine. *See Alulddin v. Alfartousi*, 255 Ariz. 436, 440 ¶ 11 (App. 2023) ("Courts of law may adjudicate disputes arising in religious contexts 'by applying neutral principles of law without inquiry into religious doctrine and without resolving a religious controversy[.]'" (quoting *Rashedi*, 203 Ariz. at 324 ¶¶ 15–16)); *see also Watson*, 80 U.S. at 733 (finding that when a church, on behalf "of one of its members[,] entertain[s] jurisdiction as between him and another member as to their individual right to property, real or personal, the right in no sense depending on ecclesiastical questions, its decision would be utterly disregarded by any civil court where it might be set up").

b.

¶**53** The Church has adopted the "fundamental Christian doctrines of repentance and confession." The Church's doctrine establishes that bishops must counsel individual members, assist their efforts to repent, and act as a member's confessor. The Bishops received Paul's admissions during counseling sessions and disciplinary proceedings that are explicitly provided for under the Church's doctrine. The Bishops also claimed that they received Paul's admissions in their role as clergy members.

20

¶54        We may not substitute our interpretation of Church doctrine for the Church's reading of its own doctrine. *See Our Lady of Guadalupe Sch.*, 591 U.S. at 746. We conclude that the Bishops received Paul's confessions or confidential communications in the course of discipline enjoined by the Church to include admissions before the Council.

4.

¶55        Finally, we consider the Reporting Statute's fifth element—whether the Bishops determined it was "reasonable and necessary within the concepts" of their religion to withhold reporting of Paul's abuse. § 13-3620(A). Although the "concepts" of a clergy member's religion may be broader than the religion's "doctrine," this inquiry effectively requires a factfinder to evaluate whether the clergy member's determination conformed with his own religious doctrine.

a.

¶56        The United States Supreme Court previously concluded that court inquiry "into whether the Church had followed its own procedures" is an unconstitutional attempt to resolve "quintessentially religious controversies." *Hosanna-Tabor*, 565 U.S. at 187. Consequently, absent evidence of fraud or collusion for secular purposes, courts are generally foreclosed from making such a determination, including in the context of resolving a "battle of the experts" opining on religious doctrine. *See Christakis*, 250 Ariz. at 249 ¶ 5; *Kedroff*, 344 U.S. at 116 & n.23.

b.

¶57        The court of appeals invoked the Church's Handbook, § 32.4.4, which required Church disclosure when necessary to prevent "serious injury," to conclude that a genuine issue of material fact existed as to "whether it was 'reasonable and necessary' for [the] Church Defendants to withhold reporting" based on the "question of whether the Church Defendants violated Church doctrine by not reporting Paul to the authorities." *Doe*, 2025 WL 2158205, at *6 ¶¶ 33–34. There is no dispute that this provision was added to the Handbook *after* the relevant events in this

21

case. Furthermore, the court's inquiry constitutes an impermissible intrusion into the Church's doctrine. *See Hosanna-Tabor*, 565 U.S. at 187; *Christakis*, 250 Ariz. at 249 ¶ 5.

¶58 The Bishops declared that Paul's confessions "had to remain confidential within the concepts of their religion," a position consistent with the Handbook. On this record, we are constrained to credit the Bishops' determination that withholding reporting of Paul's confessions or confidential communications was "reasonable and necessary" within the concepts of Church doctrine.

## IV.

¶59 The Reporting Statute and bedrock First Amendment principles compel our decision in favor of the Church Defendants in the Does' civil action against the Church Defendants for withholding reporting of Paul's abuse.

¶60 Our decision "does not mean that religious institutions enjoy a general immunity from secular laws . . . ." *Our Lady of Guadalupe Sch.*, 591 U.S. at 746. "Courts of law may adjudicate disputes arising in religious contexts 'by applying neutral principles of law without inquiry into religious doctrine and without resolving a religious controversy[.]'" *Alulddin*, 255 Ariz. at 440 ¶ 11 (quoting *Rashedi*, 203 Ariz. at 324 ¶¶ 15–16). However, as the United States Supreme Court has recognized, there is room only for "marginal civil court review under the narrow rubrics of 'fraud' or 'collusion' when church tribunals act in bad faith for secular purposes . . . ." *Serbian E. Orthodox*, 426 U.S. at 713; *Cantwell*, 310 U.S. at 306. Thus, if a court finds a religious institution submitted evidence procured through "fraud" or "collusion" for secular purposes, it will lose the Religion Clauses' protection. *See Serbian E. Orthodox*, 426 U.S. at 713; *Cantwell*, 310 U.S. at 306. Such inquiries are permissible because they ask *how* or *why* a religious institution's evidence was procured, rather than *what* the evidence means under the religious doctrine. Consequently, if a matter involving a religious institution can be resolved by applying neutral principles of law, the "ecclesiastical abstention" doctrine would not apply.

¶61   In this case, however, there is no evidence that the Church Defendants' factual allegations were procured by "fraud" or "collusion" for the secular purpose of avoiding legal responsibilities, and any inquiry into whether the Bishops adhered to Church doctrine is the antithesis of the permissible narrow review—the application of "neutral principles of law without inquiry into religious doctrine and without resolving a religious controversy[.]'" *See Alulddin*, 255 Ariz. at 440 ¶ 11 (quoting *Rashedi*, 203 Ariz. at 324 ¶¶ 15–16). On this record, and consistent with the Reporting Statute's Clergy Exemption, the First Amendment forecloses any such inquiry.

## CONCLUSION

¶62   Accordingly, we vacate the court of appeals' memorandum decision and affirm the trial court's ruling granting the Church Defendants' motion for summary judgment.